## BATTLE *v.* THE STATE.

1. Where the motion for a new trial complains of the admission in evidence of dying declarations, without specifying any witness, and several witnesses, according to the brief of evidence, gave testimony of that nature, if the testimony of one be admissible, neither the court below nor this court is bound to go further and ascertain whether the testimony of the others be admissible or inadmissible.

2. The trial court was warranted in ruling that the declarations made by the deceased to his mother were *prima facie* competent, and therefore admissible in evidence, as dying declarations.

2. If two persons, while in the house of another, upon a sudden quarrel engage in an angry scuffle, and on being ordered out by the proprietor and told by him that if they want to fight they must fight outside, instantly leave together, and immediately after passing through the door one of them inflicts a mortal wound upon the other with a knife, the homicide will be manslaughter if it was committed in the heat of passion engendered by the

scuffle, and if the use of the knife was wholly unpremeditated and entirely free from deliberation and any spirit of revenge. Otherwise the killing will be murder. In such case the question of manslaughter is fairly involved in the circumstances attending the killing, and failure of the court to charge the jury upon that grade of homicide is error.    *Judgment reversed.*
May 8, 1893.

Indictment for murder. Before Judge BARTLETT. Bibb superior court. November term, 1892.

Alonzo Battle was convicted of the murder of Son Parker, with a recommendation to life imprisonment. The only witness introduced, as to the circumstances attending the homicide, was Adolphus Mims. He testified, that on a Saturday night in January, Battle and Parker came into his store and sat down by the fire. Battle had a hat which he was offering to sell for ten cents, and finally sold it for five cents to a boy who was present. After a while Parker asked Battle for the nickel he sold the hat for. Battle refused to give it to him. Parker said: "A woman gave me that hat." Battle said: "She didn't." Parker started to take the hat from the boy, and Battle said, "No, don't take it from him. I am the one who sold the hat. Take it away from me." Thereupon Battle and Parker arose, took hold of each other and began to scuffle. Seeing this, Mims told them, if they were going to fight to get out of doors, and they quit and walked out of the door together. It was raining, and Mims shut the door after them. Two or three minutes afterwards Battle came back and said, "Where is Son?" Mims replied, "I don't know; didn't you and Son go out together?" Said Battle, "Yes, but cousin Son got away from me." He then asked for a cigar, stating that he was going home. He did not appear to be excited. He went out at once, and Mims saw no more of him that night. In about fifteen minutes Mims heard some one knock at the door, and on opening it, found Parker standing outside. Par-

ker came in and sat upon a chair, but immediately fell
to the floor unconscious, and so remained for some time.
On examination it was found that he was wounded in
the head.   This wound (which penetrated through the ·
temple) produced his death some days later, he being
partially relieved in the meantime by the performance
of a surgical operation.

The material part of the testimony of Parker's
mother, touching his dying declarations, was as follows:
" Q. I will ask you whether you ever talked with him
about his dying? A. Yes sir.   Q. When was the first
time you talked with him about it?   A. I commenced in
the beginning.   Q. When?   A. When he was first hurt.
Q. When was that? A. That was the next morning after
he was hurt. Q. On Sunday? A. Yes sir. Q. What time
of day was it?   A. In the morning.   Q. When you first
went there?   A. Yes sir.   Q. What did you say about ·
it to him?   A. I called him and asked him at first what
was the matter with him, and he said he was cut, and
cousin Alonzo cut him.   Q. State what you said to him
about his condition, as to whether he would live or die,
or what he said?   A. He asked me if I thought he
would live, and I told him I hoped he would, and I told
him he must not study that, he must think of preparing
for death and early judgment.   Q. What did he say
about it?   A. He didn't say ; he said all right.   Q. Did
he ever talk with you any other time about dying?   A.
Yes sir.   Q. When was the next time anything was
said about it ?   A. He said something to me every day
once or twice.·   Q. What would he ask you about it ?
A. He would ask me whether I thought he would live.
Q. What would you tell him ?   A. I would tell him
every time I hoped he would.   Q. What would he say?
A. He would say all right every time.   Q. On Friday
before he died, state whether you had any conversation
with him at the hospital?   A. Yes sir.   Q. At the time

he was at the hospital, state whether you went and nursed him? A. Yes sir. Q. What time did the doctors operate on him? A. In the evening after they carried him there. Q. What day was that? A. I disremember, but I think it was on Wednesday. Q. How long did he live after they operated on him? A. He lived from that Wednesday up to the Sunday week, 1 think. Q. State whether, between the time they operated upon him and the time when he died, you talked to him about dying and whether he said anything to you about it? A. Yes sir. Q. When was the first time after he was operated upon did you talk to him about whether he would get well or not? A. He called me and asked me once. Q. When was that? A. After he was operated upon. Q. How long after was that? A. It was two days after he called me and told me he need not pray any more. He said, 'I have not got any need to pray any more,' and I says, 'You don't know what you are talking about.' I says, 'You are out of your mind.' I says, 'Do you know me?' and he says, 'Oh, mama, you know I know you,' and he says 'When I die I am not going to walk to heaven; I am going to fly.' Q. Was there anything more said between you from that time on whether he would get well or not? A. No sir. From what he told me he didn't have any idea of getting well. Q. State whether or not after that time he said anything to you about how he was hurt and who hurt him? A. Yes sir; on a Friday I think he called me and said, 'Mama,' he says, 'Cousin Alonzo cut me.' The court: Was that after he told you he had no idea of getting well? A. Yes sir. Q. Was it after he talked with you about having his sins forgiven? A. Yes sir. Q. Go on. What did he say who cut him? A. He says, 'Cousin Alonzo cut me,' but he loved him and he had treated him wrong, and he loved him but he didn't love him like he did before. Q. Where did he say he cut

him? A. In the temple. Q. Where did he say it took place? A. At Mims'. Q. How did he say it was done? A. He says, 'Cousin Alonzo called me out doors, and no quicker than I put my foot on the ground he stuck the knife in my head and he knocked me down and I didn't see him any more.' Q. What did he say he did, or anything coming over him at that time? A. No sir, he didn't say anything about anything coming over him. Q. Did he remember anything else? A. He didn't see Alonzo any more afterwards. Q. That was on Friday before he died? A. Yes sir."

Of the grounds for new trial those material to this report are as follows:

1-2. " Because the court erred in admitting the sayings of Son Parker, deceased, that Alonzo Battle was the man that killed him, as dying declaration. Defendant insists this is error, because defendant claims the proper foundation was not laid, without showing to the court that the declarations were made *in extremis*, and that he believed that he was going to die, and had given up all hopes of recovery at the time of the alleged declaration, as will be seen in the brief of evidence."

3. " Because the court erred in not submitting to the jury the law of voluntary manslaughter. Defendant insists that this was error, because the facts, according to the State's theory of the case, showed that it was nothing more than voluntary manslaughter; it was insisted upon by counsel for the defendant, and contended that, according to the State's own theory in the case, it would be nothing more than voluntary manslaughter."

JOHN R. COOPER and M. G. BAYNE, for plaintiff in error.

J. M. TERRELL, attorney-general, and W. H. FELTON, Jr., solicitor-general, *contra*.